**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Charles E. Franklin, | No. CIV-04-1017-PHX-MHM |
| Plaintiff, | **ORDER** |
| vs. | |
| Jo Anne B. Barnhart, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Charles E. Franklin seeks judicial review of the Administrative Law Judge's ("ALJ") decision denying his claims for benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3).

**I.**

**Procedural History**

Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act on April 26, 2002 and for supplemental security income under Title XVI of the Act. The applications were denied initially and on reconsideration. A hearing was held before an Administrative Law Judge ("ALJ") on June 26, 2003. On July 24, 2003, the ALJ issued a decision finding that Plaintiff was not disabled. The decision became the final decision of the Commissioner on April 15, 2004 when the Appeals Council denied Plaintiff's request for review.

Having exhausted administrative review, Plaintiff timely filed his complaint for judicial review in this Court on May 19, 2004. (Doc. 1). Defendant filed an answer on July 23, 2004. (Doc. 7). Plaintiff filed a motion for summary judgment on September 22, 2004. (Doc. 10, 12, 14), and Defendant filed a cross- motion for summary judgment on October 26, 2004. (Doc. 15, 16, 17). This Court heard argument on the parties' cross motions for summary judgment on September 7, 2005.

## II.

### Standard of Review

This Court must affirm the ALJ's findings if they are supported by substantial evidence and free from reversible legal error. Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); Clem v. Sullivan, 894 F.2d 328, 330 (9th Cir. 1990).

In determining whether substantial evidence supports a decision, the Court considers the record as a whole. Richardson, 402 U.S. at 401; Tylitzki v. Shalala, 999 F.2d 1411, 1413 (9th Cir. 1993). If there is sufficient evidence to support the ALJ's determination, the Court cannot substitute its own determination. Young v. Sullivan, 911 F.2d 180, 184 (9th Cir. 1990). Where evidence is inconclusive, "questions of credibility and resolution of conflicts in the testimony are functions solely of the [Commissioner]." Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). Therefore, if on the whole record before the Court, substantial evidence supports the Commissioner's decisions, this Court must affirm. Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989); 42 U.S.C. § 405(g).

An ALJ determines an applicant's eligibility for disability benefits through the following five stages:

(1) determine whether the applicant is engaged in "substantial gainful activity";

(2) determine whether the applicant has a "medically severe impairment or combination of impairments";

(3) determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;

(4) if the applicant's impairment does not equal one of the "listed impairments," determine whether the applicant is capable of performing his or her past relevant work;

(5) if the applicant is not capable of performing his or her past relevant work, determine whether the applicant "is able to perform other work in the national economy in view of his [or her] age, education, and work experience."

Bowen v. Yucket, 482 U.S. 137, 140-41 (1987) (citing 20 C.F.R. §§ 404.1520(b)-(f)). See 20 C.F.R. § 416.920. At the fifth stage, the burden of proof shifts to the Commissioner. Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993).

## III.

## Background Facts

Plaintiff was 55 years of age at the time of the ALJ's decision. Plaintiff claimed to be unable to work as of May 18, 1999 as a result of back and neck problems, high blood pressure and degenerative joint disease and status post three knee operations. Plaintiff claimed a disability onset date of September 29, 1999. Plaintiff holds a college degree in Business Administration and has worked as an elementary and high school teacher, a personnel coordinator, an assistant manager at WalMart, and as a computer lab attendant.

(A) Plaintiff's medical history.

On January 10, 1996, Plaintiff was diagnosed with having severe degenerative arthritis of the right knee. A January 29, 1998 x-ray revealed this condition as moderately advanced. On October 12, 1999, Plaintiff sought medical care for left knee pain caused by an on-the-job injury a few days before. Plaintiff, a teacher, had sustained injury while restraining a student. Plaintiff was seen by D. Slaughter, M.D., at the Veterans Administration ("VA") Medical Center for right knee pain and a recently-experienced twisting injury to his left knee. Dr. Slaughter observed possible effusion of the right knee and proposed a cortisone injection. An x-ray of the right knee revealed moderate degenerative arthritic disease. An x-ray of the left knee showed minimal hypertrophic

- 3 -

1  changes at the lateral aspect of the intercondylar notch, a newly discovered lesion and no
2  fractures. On October 18, 1999, Plaintiff complained at the VA of ongoing pain in both
3  knees.

4  On October 21, 1999, Plaintiff presented to R. Richard Maxwell, M.D., an
5  orthopaedic surgeon, with complaints of right knee pain and joint disease. Plaintiff, who was
6  using a cane, reported that his right knee had been injured when he was in the military. Dr.
7  Maxwell recommended glucosamine injections into the right knee and attention to the left
8  knee. A November 10, 1999 MRI of Plaintiff's left knee showed a torn meniscus (fibrous
9  cartilage within the knee joint) and a focal arthritic change involving the lateral femoral facet
10 of the patellofemoral joint. Dr. Maxwell recommended arthroscopic surgery of Plaintiff's left
11 knee. On November 24, 1999, Dr. Slaughter at the VA Medical Center recommended that
12 Plaintiff be placed on light duty until his knee problems were resolved.

13 On December 29, 1999, Dr. Maxwell performed surgery on Plaintiff's left knee to
14 repair a torn medial meniscus. Dr. Maxwell prescribed post-surgery physical therapy. On
15 January 12, 2000, Dr. Maxwell examined Plaintiff's right knee and observed decreased range
16 of motion with flexion at 0-60 degrees and progressive changes and recommended total right
17 knee arthroplasty. On March 28, 2000, Plaintiff was fitted with a hinged neoprene knee
18 sleeve. On May 22, 2000, Dr. Maxwell indicated that Plaintiff may have permanent
19 restrictions with his left knee.

20 On May 15, 2000, at the request of his employer's insurer, Plaintiff was examined by
21 Irwin Shapiro, M.D. Plaintiff, who was using a cane, complained of left knee pain and that
22 his knee locked and buckled. Plaintiff's medications included ibuprofen, Vioxx
23 (intermittently) and glucosamine. Dr. Shapiro observed no effusion, heat or erythema in
24 Plaintiff's left knee and the range of motion was 0-120 degrees. Other tests were negative.
25 Dr. Shapiro recommended that Plaintiff continue physical therapy twice a week for four more
26 weeks. Dr. Shapiro opined that Plaintiff was capable of a sedentary type job with the
27 avoidance of prolonged time on his feet or squatting, kneeling or climbing.
28

1    On November 9, 2000, Dr. Shapiro found that Plaintiff's left knee was stationary and
2 that he had a 20% permanent impairment of his left lower extremity due to the earlier
3 industrial accident. Plaintiff had obvious valgus deformities of both knees,[1] slightly greater
4 on the right compared to the left. Both knees showed 1+ effusions without heat or erythema.
5 Both knees had a range of motion of 5-120 degrees. Dr. Shapiro recommended supportive
6 medical care, including nonsteroidal anti-inflammatories, occasional intra-articular steroid
7 injections, and a series of Hyalgan injections. Plaintiff at the time was using a cane in both
8 the right and left hands. Dr. Shapiro reported that Plaintiff could return to gainful
9 employment but could not perform a job that required squatting, kneeling, climbing, walking
10 up stairs or prolonged walking. Dr. Shapiro further reported that within these limitations
11 Plaintiff could work eight hours a day, 40 hours a week.

12    On November 21, 2000, Dr. Maxwell reported that Plaintiff had a 25 to 30 percent
13 permanent injury of the left lower extremity due to the previous work-related injury. Dr.
14 Maxwell noted restrictions on walking, lifting, stooping, kneeling and climbing.

15    In March and November 2001, Dr. Maxwell administered injections (Lidocaine,
16 Marcaine and Aristospan) in Plaintiff's left knee. In March 2001, Dr. Maxwell observed a
17 trace of effusion in Plaintiff's left knee but by November 2001 there was no left-knee
18 effusion and the knee straightened out well.

19    On January 30, 2002, X-rays taken at the VA Medical Center showed marginal spur
20 formation, subchondral cystic changes and moderate narrowing of the joint compartments
21 as to Plaintiff's right knee. The radiologist's impression was moderate degenerative arthritis
22 of the right knee. Steroid injections were recommended.

23    On March 25, 2002, Plaintiff was examined at the VA clinic for a rating on a service-
24 connected injury to the right knee. Plaintiff's right knee had been rated a 20% service
25 connected disability in April 2000. Plaintiff's major complaints during the examination were

---

[1]"Valgus" refers to a deformity in which an anatomical part is turned outward away from the body's midline to an abnormal degree.

- 5 -

1  worsening stiffness, constant swelling and difficulty walking. Plaintiff at the time was using
2  a cane. The examining physician observed that Plaintiff's right knee demonstrated a 10 to
3  60 degree range of motion, his patella was slightly laterally subluxed (dislocated) and
4  nontender on handling, and there was subpatellar crepitation (crackling). Other tests were
5  negative. Plaintiff had some moderate limitation of the right knee but no more functional
6  loss was expected. The examining physician opined that any type of excessive walking,
7  squatting or climbing stairs would cause severe pain.
8        On May 14, 2002, Plaintiff requested a disability rating increase (VA) for his right
9  knee. Plaintiff at the time was receiving social services from the VA that included bus tickets,
10 housing referrals and money for a new inner tube for his bicycle. Plaintiff received steroid
11 injections into his right knee on July 8, 2002 and October 3, 2002.
12       On July 10, 2002, Plaintiff was examined by Malcolm McPhee, M.D., a specialist in
13 physical medical and rehabilitation. X-rays of Plaintiff's right knee showed mild
14 compartment spurring. An x-ray showed degenerative disc changes at multiple levels in the
15 mid- and lower cervical spine. Plaintiff reported that he had been using a cane since his left
16 knee surgery. He also reported a worsening of his condition following an accident two
17 months earlier when he was hit by a van while riding his bicycle. Dr. McPhee observed that
18 Plaintiff could walk without his cane in the examining room but could not tandem walk.
19 Plaintiff could bend forward to where his fingertips reached his mid-tibia but he refused to
20 bend further because of his knees. Plaintiff squatted to about 20% normal range. Plaintiff
21 could side-bend 20 degrees bilaterally and could remove his shoes and socks and transfer
22 onto the examining table. Dr. McPhee observed that Plaintiff's deep tendon reflexes were
23 1+ bilaterally and sensation was intact to touch and pinprick in all four limbs. Dr. McPhee
24 was not convinced of any focal motor weakness in Plaintiff's ankle and knee groups.
25 Plaintiff had a range of motion of 0 to 45 degrees in his right knee and 0 to 85 degrees in his
26 left knee. Plaintiff restricted further motion due to pain. Plaintiff had normal range of
27 motion of his shoulders, elbows, hands, wrists, hips and neck. Plaintiff was resistant to some
28 of the examination which Dr. McPhee attributed to Plaintiff's fear of pain.

1    Dr. McPhee expressed the opinion that Plaintiff could lift and/or carry 20 pounds
2  occasionally and 10 pounds frequently.  He could stand or walk at least two hours in an
3  eight-hour workday; sit for six hours in an eight-hour workday with usual rest breaks; and,
4  occasionally stoop, balance or crouch.  Plaintiff was not limited in his upper extremities.  Dr.
5  McPhee opined that Plaintiff should avoid climbing, kneeling and crawling.
6    Two state agency physicians reviewed Plaintiff's medical records.  Based on his July
7  24, 2002 review, Murray Schreiber, D.O., a state agency consultative physician, opined that
8  Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, could stand and/or
9  walk at least two hours in an eight-hour workday, and sit about six hours in an eight-hour
10 workday.  Plaintiff could occasionally climb ramps or stairs, balance, stoop and crouch but
11 should never climb ladders, ropes or scaffolds, kneel or crawl.  Dr. Schreiber found Plaintiff's
12 complaints partially credible and that Plaintiff was not using narcotics for pain.  Plaintiff
13 could ambulate without a cane (even though Plaintiff used a cane).
14   Leo Kane, M.D., another state agency physician, reviewed Plaintiff's medical records
15 on September 19, 2002.  Dr. Kane agreed with Dr. Schreiber's assessment of Plaintiff's
16 residual functional capacity. Dr. Kane noted that Plaintiff's gate was antalgic (a gait assumed
17 to avoid or lessen pain) but no cane had been prescribed.  Dr. Kane commented that Plaintiff
18 rode a bicycle and concluded that the severity of Plaintiff's complaints was not supported by
19 physical findings.
20   (B)    The hearing testimony.
21   Plaintiff testified that he had been unable to work since he was injured restraining a
22 student.  Plaintiff testified that he lives in an apartment and has a driver's license.  Plaintiff
23 cooks for himself, does the dishes and housework, and sometimes reads. Plaintiff plays chess,
24 rides a bicycle and has been doing reading and research toward an advanced degree. Plaintiff
25 does not go for walks but grocery shops alone. Plaintiff does not climb stairs, but he can stay
26 on his feet for 10 to 15 minutes and can sit for 30 to 40 minutes before having to change
27 position. Plaintiff can carry a gallon of milk, although he sometimes drops it.   Plaintiff
28 testified that he cannot kneel or squat.  Plaintiff complained of no cartilage on his knees and

of bone grinding against bone. Plaintiff testified that he constantly takes 800 mg ibuprofen or otherwise could not get around. Plaintiff also takes Vioxx and has received cortisone shots for his knees. Plaintiff said he uses a cane all the time and a knee brace once or twice a week. Plaintiff testified that he was fired from his job of three to four months as a personnel coordinator when he began to miss work so he could go to the VA for knee therapy.

The vocational expert ("VE") testified that he had reviewed the file and the relevant definitions and could render an opinion in this case. The ALJ asked the VE the following questions:

(1) Assuming claimant's testimony, can the claimant perform any of his past work? The VE answered no, based in part on Plaintiff's testimony of missing work on a regular basis.

(2) Assuming a person can lift or carry 20 pounds occasionally, 10 pounds frequently, stand or walk at least two hours during an eight-hour workday, sit for six hours in an eight-hour workday with usual rest breaks, but had to avoid climbing, kneeling, crawling, and can occasionally stoop, balance or crouch, essentially unlimited in upper extremity activities, with no environmental restrictions, can the claimant perform his past relevant work? The VE answered that Plaintiff could perform the position of personnel coordinator, which is sedentary, semi-skilled work. Plaintiff could not perform work as a teacher which is light-skilled work.

(3) Has the claimant acquired skills in his past work as high school or elementary teacher or graduate assistant that would transfer into other work at the sedentary level? The VE answered that based on Plaintiff's teaching and coordination work (organization, interaction and ability to analyze skills), his skills were transferrable to sedentary jobs such as customer service representative (270,000 jobs available nationally - 10,000 in the county); financial aid counselor (120,000 jobs available nationally - 1,300 in the county); clerk (98,000 jobs available nationally - 700 in the county); and claims adjuster (20,000 jobs available nationally - 3,000 jobs in the county), all of which are sedentary, semiskilled jobs.

1   However, based on Plaintiff's testimony, the VE opined that Plaintiff would not be able to
2   perform these positions due to missed work.

3       (C)   The ALJ's conclusions.

4   The ALJ reviewed Plaintiff's work and medical history and Plaintiff's testimony
5   relevant to his daily activities. The ALJ considered Plaintiff's testimony concerning his
6   subjective complaints and inability to work and found it less than fully credible, noting that
7   Plaintiff does not require narcotic pain medication and is capable of greater levels of physical
8   activity than claimed. Plaintiff's daily activities also demonstrated that he is capable of
9   greater levels of activity than alleged.  The ALJ did not give great weight to the state agency
10  reviewing physicians (Drs. Schreiber and Kane) because they did not examine Plaintiff and
11  their opinions were not entirely consistent with the greater objective medical evidence of
12  record.  The opinions of Drs. McPhee, Shapiro and Maxwell were given greater weight based
13  on the objective nature of their examinations, their consistency with the greater objective
14  record and their treating relationship with Plaintiff.  The ALJ did not give less weight to the
15  VA medical records because of their overall consistency with the objective evidence of
16  record.

17  At the first step of the analysis, the ALJ found that Plaintiff had not performed
18  substantial gainful activity since the onset date of disability.  The ALJ determined at the
19  second step that Plaintiff's left knee injury status post surgery, status post right knee surgeries
20  times two, and his degenerative disc disease of the cervical spine were severe impairments
21  under the regulations. At the third step, the ALJ found that Plaintiff's medically determinable
22  impairments did not meet or medically equal one of the listed impairments for presumptive
23  disability, with special consideration given to Listing 1.03.  The ALJ determined at the fourth
24  step that Plaintiff was unable to perform any of his past relevant work.  The ALJ noted that
25  Plaintiff was an "individual of advanced age" with a college education and had transferrable
26  skills from skilled work previously performed.  At the fifth step, based on the Medical-
27  Vocational Guidelines in conjunction with the VE's testimony, the ALJ found that there were
28  a significant number of jobs in the national economy that Plaintiff could perform. The ALJ

concluded that Plaintiff was not under a "disability" at any time through the date of the decision.

## IV.

## **<u>Discussion</u>**

Plaintiff contends that the ALJ erred in his conclusions at the third and fifth steps of the sequential evaluation process and in rejecting Plaintiff's pain and fatigue testimony. Plaintiff contends in his motion for summary judgment that this case should be remanded for a finding of disability and benefits. At the hearing, Plaintiff's counsel argued in the alternative that this case should be remanded for further proceedings and additional findings on the relevant issues.

(A)  <u>Plaintiff's claim of error at the third step of the sequential evaluation</u>.

Plaintiff contends that the ALJ erred in making a conclusory finding that he did not meet or equal a listed impairment.  Plaintiff claims that his impairments meet or equal Listings 1.02 or 1.03. Alternatively, Plaintiff argues that the ALJ should have considered "medical equivalence" listings and that as to this determination, the signs and symptoms of all impairments must be considered in combination with each other and in light of all appropriate listed impairments. Plaintiff argues that in addition to Listings 1.02 and 1.03, the ALJ should have considered Listing 1.08.

The record shows that the ALJ found that Plaintiff's impairments did not meet or equal a Listed Impairment, giving special consideration to Listing 1.03. At the close of the administrative hearing, Plaintiff through counsel argued that the evidence supported a finding that Plaintiff's impairment met Listing 1.03. Plaintiff did not argue or refer to Listings 1.02 or 1.08. Plaintiff, however, is not precluded from raising his arguments relative to Listings 1.02 and 1.08 and equivalency in this Court even though the arguments were not raised before the ALJ. "Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop arguments both for and against granting benefits." <u>Sims v. Apfel</u>, 530 U.S. 103, 111, 120 S.Ct. 2080, 2085 (2000).  A Social Security

- 10 -

1 claimant's failure to present an issue to the Appeals Council does not waive judicial review
2 of that issue. Kokal v. Massanari, 163 F. Supp. 2d 1122, 1129 n.4 (N.D. Cal. 2001).

3       A Listed Impairment ("Listing") is one that is considered severe enough to prevent a
4 claimant from performing substantial gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If
5 a claimant's impairment meets or equals a Listing, the claimant will be found to be disabled
6 at step three of the sequential evaluation procedure. Marcia v. Sullivan, 900 F.2d 172, 174
7 (9th Cir. 1990); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proving
8 that his impairment or combination of impairments satisfies all criteria of a particular listing.
9 Sullivan v. Zebley, 493 U.S. 521, 530 (1990); Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir.
10 1999). An impairment that manifests only a portion of the requirements of a Listing, no
11 matter how severely, does not qualify as a Listed Impairment. Id.

12       According to Defendant, in order to meet either Listing 1.03 (reconstructive surgery
13 or surgical arthrodesis of a major weight-bearing joint) or Listing 1.02 (major dysfunction
14 of joints due to any cause), Plaintiff had to show, *inter alia*, that he could not "ambulate
15 effectively" because of his impairments, citing 20 C.F.R., Part 404, Subpart P, Appendix 1.
16 "Ineffective ambulation" means that an individual has insufficient lower extremity function
17 to permit independent ambulation without the use of a hand-held assistive device that limited
18 the functioning of both upper extremities. 20 C.F.R., Part 404, Subpart P, Appendix 1, 1.00
19 (A)(2)(b)(1). Plaintiff has referred the Court to 20 C.F.R., Part 404, Subpart P, Appendix 1,
20 1.00(B)(2)(b), which states that to effectively ambulate, a person must be unable to walk a
21 block at a reasonable pace on rough or uneven surfaces or carry on routine ambulatory
22 activities, such as shopping and banking, and to climb a few steps at a reasonable pace with
23 the use of a single hand rail.

24       Defendant argues that Plaintiff did not present medical evidence showing that he is
25 unable to ambulate effectively. In support of this argument, Defendant refers to Dr. McPhee's
26 observation in 2002 that Plaintiff could walk in the examining room. According to Plaintiff's
27 testimony, he rides a bicycle, grocery shops and does light housekeeping. He also drives a
28

- 11 -

1  car. Defendant also argues that Plaintiff's use of a cane was not prescribed by any of his
2  treating physicians.

3  Plaintiff contends that the ALJ did not identify these facts in support of the
4  determination at step three. In addition, the ALJ failed to consider Listing 1.02 or Listing
5  1.08. As to the latter, Defendant contends that Listing 1.08 deals with soft tissue injury, such
6  as a burn, that was under continuing surgical management as required by that specific
7  Listing. 20 C.F.R Part 404, Subpart P, Appendix 1. Plaintiff responds that Listing 1.08 is
8  not confined to burn injuries. Plaintiff also complains that the ALJ did not consider the issue
9  of medical equivalency.

10  The Court has reviewed the findings of the ALJ and notes that no specific factual
11  findings were set forth in support of the specific conclusion that Plaintiff's medically
12  determinable impairments do not meet or equal any of the listed impairments in the
13  regulations. The ALJ's conclusions are stated as follows:

> 3. The claimant's left knee injury status post surgery, status post right knee surgeries x 2, and degenerative disc disease of the cervical spine are severe impairments, based upon the requirements in the Regulations (20 CFR §§ 404.1521 and 416.921).
>
> 4. These medically determinable impairments do not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4, with special consideration given section 1.03 of the Listings.

(Doc. 7A at 23-24). Similar language is set forth in the body of the ALJ's opinion. (Doc. 7A at 19). It further does not appear that the ALJ considered Listings 1.02 or 1.08 in the determination at step three. Without specific findings stated in the record as to these Listings, the Court cannot determine whether the ALJ's decision at step three is supported by substantial evidence. See Marcia v. Sullivan, 900 F.2d 172, 176 (9th Cir. 1990)(ALJ must adequately explain why claimant's impairments did not meet or equal Listed impairments). The Court notes in this regard that the ALJ's findings included the following: "[Plaintiff] can sit for eight hours a day, stand and walk for two hours a day *with the use of a cane*, and lift and carry ten pounds. ... He must avoid repetitive walking, lifting, stooping, kneeling,

- 12 -

climbing, walking up stairs, and prolonged walking, ..." (emphasis added). As discussed above, however, Defendant has pointed out that Plaintiff's use of a cane was not prescribed by the treating physicians. The dispute in this case concerns to some degree Plaintiff's ability to ambulate effectively. The ALJ did not set forth any specific findings on this issue in the context of the identified Listings.

"'If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." Marcia, 900 F.2d at 176 (quoting Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981)). Remand is particularly appropriate where additional findings or explanation will elucidate the rationale for the ALJ's decision. See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996). The Court therefore remands this case to the ALJ for further consideration as to the reasons why Plaintiff's impairments do not meet or equal Listing 1.03 and for more specific findings on the issue. In addition, the ALJ should consider whether Plaintiff"s impairments meet or equal Listings 1.02 or 1.08. The ALJ also should consider whether a combination of Plaintiff's medical impairments establish medical equivalence.

(B)     Plaintiff's other claims of error.

The Court has considered Plaintiff's other claims of error and notes the following as relevant to the remand decision. Plaintiff contends that the ALJ's determination at step four that Plaintiff cannot perform his past relevant work should not be disturbed on appeal. Plaintiff then contends that the ALJ erred at step five in the determination that there are other jobs existing in the national economy that Plaintiff can perform. As part of this contention, Plaintiff argues that the ALJ erred in the assessment of Plaintiff's residual functional capacity, in the assessment of Plaintiff's credibility and in the hypothetical questions posed to the VE.

Defendant in its summary judgment memorandum notes that the ALJ found at step four that Plaintiff could not perform his past relevant work while the VE testified that an individual with Plaintiff's residual functional capacity could still perform his past work as a personnel coordinator, which is sedentary work. Defendant goes on to argue that "even if

1  there were errors at step five of the sequential evaluation procedure, a point not conceded by
2  the Commissioner, such errors were harmless because there is other reliable evidence which
3  shows that Plaintiff was not disabled at step four." (Doc. 17 at 4). In his response, Plaintiff
4  contends that Defendant is "now [arguing] that the ALJ's step four finding is incorrect, and
5  that the ALJ should have found that [Plaintiff] can perform his past work." (Doc. 26 at 4).

6  The record indicates that the VE expressed the opinion based on Plaintiff's testimony
7  that Plaintiff could not perform his past work or the identified sedentary positions available
8  in the national economy, noting Plaintiff's testimony that he missed work on a regular basis.
9  The VE also opined, in response to the second hypothetical question posed by the ALJ
10 incorporating certain identified limitations (lifting or carrying 20 pounds occasionally, 10
11 pounds frequently, stand or walk at least two hours during an eight-hour workday, sit for six
12 hours in an eight-hour workday with usual rest breaks, and avoiding climbing, kneeling,
13 crawling, but occasionally stooping, balancing or crouching, essentially unlimited in upper
14 extremity activities, etc.), that Plaintiff could perform his past position of personnel
15 coordinator, which is sedentary, semi-skilled work.

16 The ALJ specifically determined that Plaintiff's testimony was less than credible. As
17 part of his findings, the ALJ stated that "[t]he undersigned considered the claimant's
18 testimony concerning his subjective complaints and inability to work and found it less than
19 fully credible." (Doc. 7A at 21). The ALJ further determined, however, that Plaintiff was
20 unable to perform his past relevant work. (Doc. 7A at 24). As discussed above, the VE's
21 opinion that Plaintiff could not perform his past work was based on Plaintiff's testimony.
22 The ALJ further determined that "[Plaintiff's] ability to perform all or substantially all of the
23 requirements for sedentary work is impeded by additional exertional and/or non-exertional
24 limitations." (Doc. 7A at 23). The ALJ nonetheless concluded that Plaintiff had the residual
25 functional capacity for sedentary work activity and that there were a significant number of
26 such jobs in the national economy that Plaintiff could perform.

27 These findings do not seem entirely consistent, especially in the context of
28 Defendant's claim of "harmless error" at step five and possibly even step four. It is not clear

1  to the Court if error, harmless or otherwise, occurred at step four and/or step five of the
2  sequential evaluation process. For example, it is not clear on what basis the ALJ determined
3  that Plaintiff was unable to perform his past work in light of the ALJ's other finding that
4  Plaintiff's subjective complaints and allegations of inability to work were "not totally
5  credible." (Doc. 7A at 24). It also is not clear on what basis the ALJ determined that Plaintiff
6  could perform a range of sedentary work given Plaintiff's limitations, in light of the VE's
7  opinion based on Plaintiff's testimony that Plaintiff could not perform the identified sedentary
8  jobs available in the national economy and in contrast to the medical evidence of record.

9       If, on remand, this case proceeds to review at steps four and five of the sequential
10 evaluation, the ALJ should set forth specific findings on the issues raised and considered
11 relevant to the determination on each of these steps. The ALJ should further clarify any
12 findings relevant to the assessment of Plaintiff's credibility and as relevant to the ALJ's
13 reliance on the medical information and/or hearing testimony, including the VE's opinion
14 testimony, so the Court can ascertain the basis for each finding and conclusion reached.

15      **Accordingly,**

16      **IT IS ORDERED** that Plaintiff's motion for summary judgment (Doc. 10) is granted
17 in part and denied in part.

18      **IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment is
19 granted to the extent that Plaintiff seeks remand of this matter for further proceedings.

20      **IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment is
21 denied to the extent that he seeks reversal of the Commissioner's decision and payment of
22 benefits.

23      **IT IS FURTHER ORDERED** that Defendant's cross motion for summary judgment
24 (Doc. 15) is denied.

25      **IT IS FURTHER ORDERED** that this case is remanded to the Commissioner for
26 further proceedings consistent with this Order.

27
28

1  DATED this 26th day of September, 2005.

_____
Mary H. Murguia
United States District Judge